UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CV-278-F
No. 5:13-CV-279-F

| | | |
|---|---|---|
| CWCAPITAL ASSET MANAGEMENT, LLC, solely in its capacity as Special Servicer to U.S. BANK, et al., | ) ) ) ) ) | |
| Appellants, | ) ) | ORDER |
| v. | ) ) | |
| BURCAM CAPITAL II, LLC, | ) ) | |
| Appellee. | ) ) | |

CWCapital Asset Management, LLC ("CWC") appeals the bankruptcy court's order denying its motion to dismiss Burcam Capital II's ("Burcam") Chapter 11 bankruptcy reorganization plan and the order confirming the plan. The appeal has been fully briefed and is ripe for resolution. For the reasons that follow, the bankruptcy court's order confirming the plan is REVERSED and this matter is REMANDED to the bankruptcy court for further proceedings. In addition, the CWC's motion to stay the adversary proceedings below [DE-26], Burcam's motion to stay this appeal pending determination of standing [DE-27], and the CWC's motion to aid in enforcement of order [DE-24] are all DENIED without prejudice to raise these issues with the bankruptcy court in the first instance.

## FACTUAL AND PROCEDURAL HISTORY

Burcam Capital owns a large commercial real estate development in Raleigh, North Carolina. Burcam obtained two sizeable loans from Archon Financial to purchase the development and, in return, Burcam executed two promissory notes secured by deeds of trust on the property in favor of Archon.[1] Burcam filed for Chapter 11 bankruptcy protection on June 28, 2012. In its schedules, Burcam lists the two loans, referred to as "Note A" and "Note B" as totaling $11,453,808.08 on Note A and $782,245.37 on Note B. The Note Holders have filed proofs of claims in the amount of $14,014,329.16 on Note A and $1,115,569.43 on Note B. CWC is the only secured creditor in the case, and the property is valued at between $17.3 and $18.5 million. The unsecured nonpriority claims in this case total approximately $46,000.[2]

In a Chapter 11 reorganization, the debtor places creditor claims into separate classes and each class votes to either confirm or reject the debtor's reorganization plan. At least one impaired class must vote to accept the plan.[3] 11 U.S.C. § 1129(a)(10). Burcam's original

---

[1] After a complex series of assignments, the notes are now apparently held in a mortgage trust by Greenwich Capital Commercial Funding Corporation. U.S. Bank currently serves as the trustee and CWC operates as the "Special Servicer" on behalf of the Noteholders. For purposes of simplicity, the court refers to all of the Appellants as "CWC."

[2] There is a slight discrepancy in the total amount of nonpriority unsecured claims in this case. CWC's brief indicates the total "filed proofs of claim" is $45,597.49. The bankruptcy court's order indicates that the nonpriority unsecured claims total $41,798.54. Burcam notes that the "amount of the claim and value of the collateral is not at issue in this appeal." Burcam Brief [DE-20] at 2. The court will use the $45,597.49 amount because it is more favorable to Burcam in light of the discussion below.

[3] A class of claims is impaired unless, among other things, the chapter 11 plan "leaves unaltered the legal, equitable, and contractual rights [of each claimant in the class]." 11 U.S.C. § 1124(1). The parties do not dispute that each class of unsecured creditors is "impaired" under the plan. A class votes to accept the plan if the yes votes constitute two-thirds in amount and one-half in number of the total claims held by claimants in the class who voted on the plan. § 1126(c). Neither party disputes that Burcam's accepting impaired class also meets this requirement.

2

Case 5:13-cv-00278-F   Document 38   Filed 06/24/14   Page 2 of 19

Chapter 11 plan divided the unsecured claims into two separate classes:[4] general unsecured claims in class 5 and small unsecured claims in class 6. The plan provided for payment in full to all creditors. After receiving the plan, CWC filed a motion to dismiss the bankruptcy case arguing, among other things, that Burcam could not propose a confirmable plan under the Bankruptcy Code. While the motion to dismiss was pending, voting on the plan proceeded. In an effort to block confirmation of the plan, CWC purchased sixteen unsecured claims, representing approximately 68% of the unsecured claims (approximately $31,280 of the total $46,000), and filed rejecting ballots on behalf of each of those claims. Of the remaining unsecured claims, only two creditors, whose claims total approximately $6,000 in this nearly $14 million bankruptcy case, voted to accept the plan. The majority of the unsecured creditors failed vote on the plan.

When Burcam realized it did not have sufficient votes to confirm the plan, Burcam requested a continuance of the confirmation hearing, which the bankruptcy court granted. Burcam used the additional time to modify its Chapter 11 plan. It created a third class of unsecured claims consisting entirely of the unsecured claims purchased by CWC. Burcam proposed transforming the CWC-purchased unsecured claims into claims secured by a deed of trust on the property and repaying those claims in full with interest at 3.75% over the course of ten years. This arrangement allowed for potential confirmation because it placed all the rejecting votes in one class and, of the remaining "impaired" classes, at least one voted to accept the plan. § 1129(a)(10). The process is known as a "cramdown" under § 1129 because the impaired class of CWC-purchased claims was forced to accept the plan despite their dissenting votes. Thus,

---

[4] The secured claims were placed in a separate class.

3

Case 5:13-cv-00278-F   Document 38   Filed 06/24/14   Page 3 of 19

Burcam's classification allowed for confirmation over the dissenting votes of a creditor who owned approximately 68% of all the unsecured claims and who possessed a secured claim that represented nearly 80% of the total value of the estate. At the confirmation hearing, CWC renewed its argument that the plan should be dismissed. Among other things, CWC argued that Burcam created the separate class of "no votes" solely for purposes of manipulating the vote to confirm the plan, which is prohibited under Fourth Circuit precedent. *See In re Bryson Props. XVIII*, 961 F.2d 496, 502 (4th Cir. 1992). Burcam argued that it separately classified the CWC-purchased claims because it needed to pay trade creditors (who owned most of the non-CWC-purchased claims) on a shorter time frame than claims owned by the secured creditor to maintain business goodwill with the trade creditors. In a written order, the bankruptcy court accepted this argument, finding that Burcam articulated a "legitimate business reason" for the separate classification and denied CWC's motion to dismiss. *In re Burcam Capital II, LLC*, No. 12-04729-8-JRL, 2013 WL 593709 (Bankr. E.D.N.C. Feb. 15, 2013) [DE-1-1]. By separate order, the bankruptcy court confirmed Burcam's Chapter 11 plan. *In re Burcam Capital II, LLC*, No. 12-04729-8-JRL (Bankr. E.D.N.C. Feb. 26, 2013) (slip opinion) [DE-1-1, case no. 5:13-CV-279-F]. This appeal followed.

## STANDARD OF REVIEW

Federal district courts have jurisdiction to hear appeals from a bankruptcy court's final orders. 28 U.S.C. § 158(a). The bankruptcy court's findings of fact must be premised upon oral or documentary evidence and are reviewed for clear error. Fed. R. Bankr. P. 8013. A factual finding is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). The bankruptcy court's conclusions of law are reviewed de novo. *Sartin v. Macik*, 535 F.3d 284, 287 (4th Cir. 2008).[5] Mixed questions of law and fact are reviewed under a hybrid approach: the ultimate conclusion of law is reviewed de novo but the supporting factual findings are reviewed for clear error. *See DHHS v. Smitley*, 347 F.3d 109, 116 (4th Cir. 2003).

## DISCUSSION

The issue presented by this appeal is whether Burcam's separate classification of the CWC-purchased claims is permissible under *In re Bryson Properties XVIII*, 961 F.2d 496, 502 (4th Cir. 1992). Subsection 1122(a) of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. § 1122(a). However, this language does not prohibit separate classification of similar claims, so long as all claims placed in a particular class are substantially similar. *Bryson Props.*, 961 F.2d at 502. In *Bryson Properties*, the Fourth Circuit considered a Chapter 11 plan similar to this case, in which the debtor separately classified the unsecured claim held by a secured creditor from the other secured claims. *Id.* at 499. The Fourth Circuit held that although a debtor has some flexibility to place unsecured claims into different classes, the debtor's discretion is not unlimited:

> Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited. There must be some limit on the debtor's power to

---

[5] The standard of review is different when the district court reviews bankruptcy court decisions in "non-core proceedings." However, the bankruptcy orders at issue in this appeal arise out of core proceedings. *Wood v. Wood*, 825 F.2d 90, 97 (5th Cir. 1987) ("If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding . . . ."). Of course, a Chapter 11 confirmation is a proceeding that would only occur in bankruptcy.

5

Case 5:13-cv-00278-F   Document 38   Filed 06/24/14   Page 5 of 19

classify creditors . . . . The potential for abuse would be significant otherwise . . . . If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed.

*Id.* at 502 (quoting *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990)). "Thus, although separate classification of similar claims may not be prohibited, it 'may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims.'" *Id.* (quoting *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991)). Because the debtor in *Bryson* "failed to offer any reason for separate classification of the unsecured claims which will withstand scrutiny[,]" the Fourth Circuit held that "[t]he classification is clearly for the purpose of manipulating voting and it may not stand." *Id.*

As a general rule, if a debtor can articulate a legitimate business justification for separate classification of unsecured claims, the courts will allow separate classification. *In re Briscoe Enters., Ltd.*, 994 F.2d 1160, 1167 (5th Cir. 1993); *Greystone*, 995 F.2d at 1281 n.7; *In re Deep River Warehouse, Inc.*, No. 04-52749, 2005 WL 2319201, a *6 (M.D.N.C. Sept. 22, 2005). The most frequently-advanced "legitimate business justification" (and the one advanced here) is the need to pay trade creditors on a different timetable than other unsecured creditors. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 247 (Bankr. S.D.N.Y. 2007); *Deep River*, 2005 WL 2319201, at *6-7. A bankruptcy court finding that the debtor has offered a legitimate business justification is a factual finding, reviewable only for clear error. *Briscoe Enters.*, 994 F.2d at 1167; *Greystone*, 995 F.2d at 1281 n.7.

**A. Clearly Erroneous Standard**

Because the bankruptcy court's finding that Burcam articulated a legitimate business justification in this case implicates clear error review, the court explains this aspect of the

6

standard of review in more detail. The clearly erroneous standard is highly deferential to the bankruptcy court's findings of fact. As noted, a finding is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573; *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012). The appellate court may not reverse a finding of fact based solely on its conviction that it would have decided the case differently. *Anderson*, 470 U.S. at 573. Instead, "[i]f the [bankruptcy court's] account of the evidence is plausible in light of the record viewed in its entirety [the finding must be upheld]" or "[if] there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 573-74; *United States v. Stevenson*, 396 F.3d 538, 542 (4th Cir. 2005). The standard applies to findings based on credibility determinations and findings based on documentary or other objective evidence. *Anderson*, 470 U.S. at 574-75. The Supreme Court has also noted that credibility determinations receive even greater deference:

> [O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Id.* at 575 (citations omitted); *Hall*, 664 F.3d at 462.

**B. Bankruptcy Court's Finding**

The bankruptcy court found that Burcam articulated a legitimate business justification for separate classification of these claims, accepting Burcam's argument that separate classification was warranted because Burcam needed to pay the trade creditors more quickly than CWC. As the bankruptcy court explained, "[t]he justifications given for classifying the [CWC] purchased claims separate from the other classes included the debtor's desire to maintain trade and professional relationships with the creditors contained in classes 5 and 6. Paying such creditors quickly fosters relationships for future business. That rationale simply does not apply to the claims which were purchased by [CWC]." *In re Burcam Capital II, LLC*, 2013 WL 593709, at *4. The bankruptcy court also noted that "[t]he impetus to pay an off-duty police officer's claim quickly is no longer a driving force once an institutional creditor such as [CWC] purchases the claim. Therefore, the desire to pay the unsecured claims not purchased by [CWC] more quickly is a legitimate business purpose." *Id.*

The court agrees that in the appropriate case paying trade creditors on a shorter time frame than larger institutional creditors is a legitimate business justification for separate classification of otherwise similar unsecured claims, especially if such treatment is necessary for an effective reorganization. However, in the context of this case, the finding is clearly erroneous. The only evidence supporting Burcam's purported justification in this case was counsel for the debtor's proffer at the confirmation hearing that Burcam "desired" to pay trade creditors first and testimony from the debtor's principal, Neal Coker. *See In re Burcam Capital II, LLC*, 2013 WL 593709, at *2. At the confirmation hearing, Mr. Coker testified as follows: "[t]hey [CWC] are different from the cops, and frankly other trade creditors that we want to continue using. We've

8

got to keep those guys happy. We don't have to keep—we don't have the same articulable business reason for these guys, to keep [CWC] happy, so we classify it separately."

Tr. of Hr'g on Confirmation [DE-19-49] at 699. Later, the following exchange between Burcam's counsel and Mr. Coker occurred:

> Q: [W]hy do you want to pay the vendors you're still working with on a different time frame?
>
> A: Because, I mean, it was painful enough to have to file bankruptcy and never had to do anything like that before. And so, being able to pay [our] debts on a timely basis and maintain good business relationships is important.

Tr. of Hr'g on Confirmation [DE-19-51] at 809.

This evidence cannot be viewed in a vacuum, especially in light of the overwhelming evidence of gerrymandering in this case. As CWC stresses, Burcam initially placed the majority of the unsecured creditors into a single class and proposed payments to all of them on the same timetable. It was only after Burcam learned that CWC had purchased a majority of the unsecured claims and used these votes to reject the plan that Burcam modified the plan to segregate all the "no votes" into a single class, allowing for ultimate confirmation. This is obvious gerrymandering. If paying the trade creditors first was so important to Burcam, it could have classified them differently from the beginning. Burcam's segregation of the no votes after it discovered the results of the voting is substantial evidence of voting manipulation and the bankruptcy court inexplicably failed to address this evidence, preferring instead to wholly credit the debtor's self-serving business justification.

Moreover, in finding that Burcam advanced a legitimate business justification for separate classification, the bankruptcy court relied on evidence provided by the debtor's counsel and Mr. Coker, two persons who cannot speak for the trade creditors and with strong incentives

9

to oversell Burcam's business justification. In fact, Mr. Coker affirmatively testified that he has limited (at best) knowledge of Burcam's current relationships with the trade creditors. *See, e.g.*, Tr. of Hr'g on Confirmation [DE-19-52] at 825-27 ("I've always had third party management that separately bids out maintenance . . . ."; "Q [from CWC's counsel]: The things that I'm going to ask you about, specific vendors, you don't have any personal knowledge of those or are all those issues ones that would need to be asked of a management company? A [from Mr. Coker]: I am aware of [the vendors], but I didn't negotiate [the contracts] and some of these vendors I have no direct contact with."). Thus, any finding that separate classification was necessary to maintain goodwill with the trade creditors is highly suspect given the debtor's only evidence on this point came from a person with limited knowledge of the trade creditor relationships. Although a finding of fact may receive considerable deference, when the finding is not supported by the record, it cannot stand. *See In re Kmart Corp.*, 359 F.3d 866, 868 (7th Cir. 2004) (refusing to credit bankruptcy court finding where "the record contains only some sketchy representations by counsel plus unhelpful testimony by Kmart's CEO, who could not speak for the vendors.").

The bankruptcy court also failed to consider a number of other aspects of the record that conflict with Burcam's proffered business justification. For one thing, most of the trade creditors failed to even vote on the plan. *In re Burcam Capital II, LLC*, 2013 WL 593709, at *1 (noting that prior to the modification only two of the non-CWC-purchased claims voted to accept the plan, and the remaining fifteen claimants failed to submit ballots). The trade creditors' lack of interest in the bankruptcy or the payment schedule for their own claims—which was known to Burcam prior to modification—strongly suggests different treatment was not necessary to

10

maintain business relationships with these creditors.[6] This fact, which the bankruptcy court did not consider, suggests the separate classification was designed solely for purposes of manipulating the vote on the plan. Furthermore, the unsecured claims in this case total at most $46,000, of which CWC purchased 68% or $31,280. That means Burcam's remaining trade creditor claims in this case total approximately $14,720.[7] The amount of these claims, as well as the relatively limited amount of total unsecured debt relative to the total value of the estate, also cast doubt on Burcam's suggestion that it needed to pay these claims on a quicker time frame to maintain important relationships with trade creditors.

For the foregoing reasons, the bankruptcy court's finding entirely fails to account for the substantial evidence of gerrymandering in this case, and this court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573. This is not a case where "there are two permissible views of the evidence" or the bankruptcy court's finding "is plausible in light of the record viewed in its entirety." *Id.* at 573-74. This court also finds that Mr. Coker's testimony is not credible in light of the record as a whole. The bankruptcy court observed this witness and credited the testimony and ordinarily that determination is entitled to considerable deference. *Id.* at 574-75. However, the evidence of gerrymandering in this case is overwhelming and amply contradicts Mr. Coker's testimony. *See id.* at 575 (explaining appellate court may overturn a credibility determination where

---

[6] The two accepting votes came from insiders of the debtor, who presumably have a personal stake in an effective reorganization.

[7] The court also notes that at the time of confirmation, the debtor had approximately $650,000 cash on hand, which it could have used to pay the trade creditors immediately. Of course, that was not done.

11

"[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it."); *see also Kmart Corp.*, 359 F.3d at 868 (refusing to credit bankruptcy court finding where "the record contains only some sketchy representations by counsel plus unhelpful testimony by Kmart's CEO, who could not speak for the vendors."). The bankruptcy court's legitimate business justification finding is clearly erroneous.

The failure to consider the evidence of gerrymandering also produced an error of law, which this court reviews de novo. *See Smitley*, 347 F.3d at 116 (explaining that conclusions of law are reviewed de novo when the alleged error involves mixed questions of law and fact). The bankruptcy court's opinion, which wholly credited the debtor's proffered justification despite substantial record evidence of gerrymandering, suggests that paying trade creditors more quickly is essentially a per se permissible business justification. That is not the law in the Fourth Circuit:

> Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited. There must be some limit on the debtor's power to classify creditors. . . . The potential for abuse would be significant otherwise. . . . If the . . . classifications are designed to manipulate class voting . . . the plan cannot be confirmed.

*Bryson Props.*, 961 F.2d at 502 (quoting *Holywell Corp.*, 913 F.2d at 880). If a debtor may simply state on the record that it separately classified trade creditor claims because it "desires" to pay them more quickly than institutional creditors, without any documentary or other evidence that separate classification will actually enhance the chances for an effective reorganization, *see Briscoe Enters.*, 994 F.2d at 1167, the debtor's classification discretion is not meaningfully limited. This is amply demonstrated by the facts of this case. If the bankruptcy court's finding is not overturned, Burcam will be allowed to propose a plan, learn after the votes are cast that the

plan is not confirmable, re-classify the unsecured claims such that all the no votes are in one class, and thereby develop a confirmable plan that crams down the interests of the overwhelmingly largest creditor in the case. Such obvious gerrymandering cannot "withstand scrutiny" under *Bryson* nor is it supported by the Bankruptcy Code itself, which aims to protect, not disenfranchise, the creditors holding the largest stakes in the bankruptcy. *See In re Boston Post Rd. Ltd. P'ship*, 21 F.3d 477, 482-83 (2d Cir. 1994) ("A key premise of the Code is that creditors holding greater debt should have a comparably greater voice in reorganization.").

**C. Separate Treatment and Similarity of the Unsecured Claims**

Burcam also argues that separate classification was warranted because the CWC-purchased claims and the trade creditor claims received different treatment under Burcam's modified plan. In *Bryson* the Fourth Circuit noted "[w]here all unsecured claims receive the same treatment in terms of the Plan distribution, separate classification . . . is, at a minimum, highly suspect," 961 F.2d at 502. However, that statement does not mean different treatment under the plan is sufficient, standing alone, to warrant separate classification of similar claims. *Bryson*'s holding is that separate classification "'may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class'" and the debtor's proffered justification must "withstand scrutiny." *Id.* (quoting *Greystone*, 995 F.2d at 1279). As the bankruptcy court recognized, both different treatment and a legitimate business purpose are required. *See In re Burcam Capital II, LLC*, 2013 WL 593709, at *4.

Burcam also submits that once CWC purchased the unsecured claims, those claims were not "substantially similar" to the trade creditor claims and therefore the Bankruptcy Code requires separate classification. *See* § 1122(a) ("[A] plan may place a claim or interest in a

13

particular class only if such claim or interest is substantially similar to the other claims or interests of such class."); *In re Loop 76*, 465 B.R. 525, 536-37 (9th Cir. BAP 2012) (explaining the "legitimate business justification" inquiry is unnecessary if the claims are not substantially similar as a threshold matter). Burcam's position is essentially that all general unsecured claims are not created equal. Trade creditor claims, according to Burcam, require payment on a shorter time frame than other unsecured claims to foster goodwill with those creditors who remain involved in business dealings with the debtor. Conversely, unsecured claims held by large secured creditors are not "substantially similar" to trade creditor claims because there is no need to protect an ongoing business relationship with secured institutional creditors. Thus, according to Burcam, differences in the identities of the holders of unsecured claims renders the claims themselves dissimilar and warrants separate classification.

Contrary to Burcam's position, the general rule is that the identity of the holder does not render the claims themselves dissimilar. The Code itself refers to the similarity of the claims, not the similarity of the holders of the claims. *See* § 1122(a) ("[A] plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."); *In re Woodbrook Assocs.*, 19 F.3d 312, 318-19 (7th Cir. 1994) (allowing for separate classification of deficiency claims based on the "legal difference between the two claims"). In this case, both the trade creditors and CWC own general unsecured claims. There is no difference between the claims themselves, all of which remain typical general unsecured debt Burcam incurred in the course of doing business; the only distinguishing feature is the identity of the holders. While in the appropriate case the identity of the holder may provide a legitimate business justification for separate classification of similar claims, the identity of the

14

holder standing alone is not a basis for finding the claims themselves are dissimilar. *See In re Johnston*, 21 F.3d 323, 327 (9th Cir. 1994) (explaining substantial similarity analysis requires evaluation of "the nature of each claim, i.e., the kind, species, or character of each category of claims"); *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 297 (Bankr. N.D. Ill. 2008) ("This determination should focus on the nature or legal attributes of the claims and not on the status or circumstances of the claimants."); *In re Frascella Enters.*, 360 B.R. 435, 442 (Bankr. E.D. Pa. 2007) ("The similarity of claims is not judged by comparing creditor claims *inter se*. Rather, the question is whether the claims in a class have the same or similar legal status in relation to the assets of the debtor.").

To support its contrary argument, Burcam cites to *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004), in which the bankruptcy court approved separate classification between "noteholders" and trade creditors, finding that the claims were not substantially similar. *Id.* at 350-51. The *Coram* court held that "[t]he Noteholders do represent a voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization case." *Id.* However, that determination was made on the basis of the nature of the legal claims themselves, as opposed to the identity of the holders of the claims. *See id.* at 348-51. As the *Coram* court emphasized, the Noteholder's claims in that case "arose from the purchase of notes [before the bankruptcy], not the provision of services to the debtor." *Id.* at 349. Thus, in *Coram*, the Noteholders purchased corporate debt notes from the debtor prior to the bankruptcy and, as a result of the nature of the claims, the voting interests of the Noteholders were different than the voting interests of the trade creditors. *Id.* at 350-51. The *Coram* court simply did not address assignment of claims that took place after the bankruptcy.

15

Unlike *Coram*, CWC in this case purchased the trade creditor claims after the bankruptcy petition. Therefore, at the time CWC purchased the claims, the legal nature of the claims were precisely the same: general unsecured debt owed to trade creditors. The nature of the claim is not altered by post-petition assignment. *See In re Enron Corp.*, 379 B.R. 425, 435-36 (S.D.N.Y. 2007) (explaining "an assignee stands in the shoes of an assignor" and "[t]hese [principles] apply with the same force to [post-bankruptcy] transfers of debt and claims" (internal quotation marks omitted)); *In re KB Toys, Inc.*, 470 B.R. 331, 335 (Bankr. D. Del. 2012) ("[A] claim in the hands of a transferee has the same rights and disabilities as the claim had in the hands of the original claimant."). Thus, the only distinguishing feature between the CWC-purchased debt and the trade creditor debt in this case is the identity of the holder. As the *Coram* court itself repeatedly noted, "a proper determination of what claims are 'substantially similar' focuses on the legal attributes of the claims, not who holds them." *See, e.g.*, *Coram*, 315 B.R. at 350. The CWC-purchased claims and the trade creditor claims are therefore substantially similar under the Bankruptcy Code.

To summarize, the court holds that the bankruptcy court's legitimate business justification finding was clearly erroneous and that separate classification in this case is not otherwise permitted under the Bankruptcy Code. Accordingly, the bankruptcy court's orders denying CWC's motion to dismiss and confirming the plan are REVERSED.

**D. Remand for Further Proceedings is Necessary**

Although CWC requests that the court reverse with instructions to the bankruptcy court to dismiss Burcam's Chapter 11 case, in the court's view such an order would be premature. As CWC acknowledges, Burcam can mount other challenges to CWC's voting on the plan. For

16

example, Burcam may wish to pursue an argument that CWC's no votes were submitted in a bad faith attempt to block confirmation of the plan. *See* § 1126(e). However, because the evidence of gerrymandering in this case is overwhelming, Burcam should not be permitted to segregate the CWC-purchased claims on remand.

The court recognizes this outcome is somewhat unfair to Burcam. Burcam has proposed full repayment to all its creditors and there is every indication in the record that it will be able to successfully reorganize. Despite the fact that the plan proposes to pay it in full, the largest secured creditor is attempting to block confirmation of the plan, presumably because it wishes to foreclose on the property. But this fact does not absolve Burcam of its responsibility to comply with the statutory requirements of Chapter 11 and the Fourth Circuit law interpreting them. If Burcam wishes to argue that the "no votes" were cast in bad faith, the remedy for that is a motion under § 1126(e), not a transparent attempt to gerrymander the votes under § 1122.

**E. Remaining Motions**

Despite the court's prior order staying the Bankruptcy proceeding pending appeal, the parties have become embroiled in a number of ancillary disputes while the court considered the appeal. These disputes produced the following motions: (1) motion to aid in enforcement of [the stay] order [DE-24]; (2) motion to stay adversary proceedings [DE-26]; and (3) motion to stay entry of order pending determination of standing[8] [DE-27]. All of these motions are DENIED without prejudice to raise them in the first instance with the bankruptcy court on remand.

---

[8] Burcam does not challenge the court's jurisdiction to hear the appeal in this motion. Instead, it appears Burcam's standing argument is actually a "real party in interest" challenge under Federal Rule of Civil Procedure 17(a), which is not a jurisdictional challenge. *See Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 90 (2005).

With respect to the motion to aid in enforcement of order [DE-24], the court recognizes that it may have caused some confusion in its order allowing CWC's motion to stay. Therein, the court stated "[i]n general, the parties should resume their respective bankruptcy positions held immediately before the Chapter 11 plan was confirmed." The court's intention was to ensure that the plan did not become substantially consummated before it ruled on the underlying merits of the appeal. However, the court did not intend to require the return of every payment made between the time the plan was confirmed and the stay was granted. As Burcam notes, it could not have predicted that the stay would be granted and it was not in violation of this court's order when it made the payments, because the court had not ruled at that time. Therefore, to the extent CWC's motion relies on a purported violation of the court's stay order, that argument should not be pursued on remand. However, CWC raises a number of other arguments that the payment was improper under the Bankruptcy Code and prior orders of the bankruptcy court. Those arguments should be pursued in the bankruptcy court in the first instance.

## CONCLUSION

The bankruptcy court's orders denying CWC's motion to dismiss and confirming the plan are REVERSED. The remaining motions [DE-24, -26, -27] are DENIED without prejudice to raise the issues with the bankruptcy court on remand. This case is REMANDED to the bankruptcy court for further proceedings consistent with this opinion. The Clerk of Court is DIRECTED to close this case and case number 5:13-CV-279-F (the consolidated appeal).

SO ORDERED.

This the $\overset{\wedge}{24}$ day of June, 2014.

                                            *James C. Fox*
                                            JAMES C. FOX
                                            Senior United States District Judge

19

Case 5:13-cv-00278-F   Document 38   Filed 06/24/14   Page 19 of 19